Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000491
28-FEB-2018
10:43 AM

NO. CAAP-15-0000491

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellant, v.
JOEL H. WHITE, Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CR. NO. 14-1-0137K)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, and Leonard and Reifurth, JJ.)

     A jury found Defendant-Appellee Joel H. White guilty of
Attempted Murder in the Second Degree.  White filed a Motion for
New Trial, claiming that the Circuit Court of the Third Circuit
("Circuit Court")[1] should have given the jury an instruction on
the affirmative mitigating defense of extreme mental or emotional
disturbance ("EMED") in light of the Circuit Court's independent
obligation to give the EMED instruction where there was some
evidence of EMED and of the deputy prosecutor's closing argument,
which, White claims, clearly invited the jury to consider his
mental and emotional condition as a motive for the alleged
conduct.  The Circuit Court granted the motion and Plaintiff-
Appellant State of Hawaiʻi appealed.

     Although White argued, and the Circuit Court agreed,
that there were no facts supporting an EMED instruction prior to
closing arguments, we concur with the Circuit Court that it was
mistaken in its original ruling and that there was a "scintilla

---

[1]    The Honorable Ronald Ibarra presided.

of evidence" adduced at trial that White may have committed the instant offense under EMED which was highlighted by the State's subsequent closing argument and which warranted the instruction. Therefore, we affirm.

I.   BACKGROUND

A.   Underlying Offense

On April 21, 2014 the State charged White with Attempted Murder in the Second Degree, in violation of Hawaii Revised Statutes ("HRS") sections 705-500(1)(b) (2014)[2] and 707-701.5(1) (2014)[3], and Burglary in the First Degree, in violation of HRS section 708-810(1)(a)-(c) (2014)[4]. The focus of this appeal is only on the Attempted Murder in the Second Degree charge.

B.   Procedural History

1.   The trial

On April 28, 2015, the jury trial for the underlying

---

[2]   The statute provides, in relevant part, "A person is guilty of an attempt to commit a crime if the person . . .(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime."  Haw. Rev. Stat. § 705-500(1)(b).

[3]   The statute provides, in relevant part, "Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person." Haw. Rev. Stat. § 707-701.5(1).

[4]   The statute provides, in relevant part,

A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

(a)   The person is armed with a dangerous instrument in the course of committing the offense;

(b)   The person intentionally, knowingly, or recklessly inflicts or attempts to inflict bodily injury on anyone in the course of committing the offense; or

(c)   The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

Haw. Rev. Stat. § 708-810(1)(a)-(c).

offense commenced under Cr. No. 14-1-0137K. The State called as its main witness the victim, Jeremy Nicholas. Nicholas testified that White and Ahlea Giles were in a romantic relationship during the time of the offense. Nicholas also testified that he had sexual relations once with Giles (i.e., an affair) approximately one month prior to the offense while White and Giles were in a relationship and that White was aware of Nicholas' affair with Giles.

White testified that on the day of the incident he had difficulty locating Giles when he came home from work. When White learned that Giles was sleeping at Nicholas' house, he made numerous attempts to phone Giles to speak with her, but each time Giles would hang up the phone. This caused White to send a text message to Nicholas saying, "WTF," explained by White as "'What the fuck,' you know, 'WTF.' Like 'Why you keep hanging up on me?'" Thereafter, White appeared at Nicholas' house to retrieve Giles. While Giles slept on Nicholas' bed, White remained at Nicholas' home for about two to three hours watching videos.

The events leading up to the offense in which White cut Nicholas' throat and stabbed Nicholas are unclear as White's and Nicholas' testimonies are in conflict. White testified that a fight between he and Nicholas eventually ensued after they had been watching videos which resulted in Nicholas' injuries. Nicholas testified that White came up behind him while he was facing his computer and without saying anything, White slit his throat with a knife, and when he tried to run for help, White chased and continued to stab him.

White testified that right before the fight ensued Nicholas "asked me kind of, uh, in like a kinda weird way. He's like, 'Why does [Giles] keep showing up? I told you not to let her just keep showing up to my house.'" White also testified that Nicholas "kinda raised his voice, and he's like, 'I heard [Giles] is a narc.' And I'm like -- and then I got kinda like mad." Preceding these events, Nicholas testified that upon arriving at Nicholas' house, White "seemed upset from what I noticed. . . . He was kinda quiet and wasn't really talking. That's not normal." Nicholas additionally testified that "I

3

thought maybe [White] was upset with [Giles]. She had hung up on him. I thought maybe. . . [White] was upset with her."

Following the presentation of evidence at trial, but before closing argument, while both the State and defense counsel were discussing jury instructions with the Circuit Court, the State argued for giving jury instructions on the affirmative mitigating defense of EMED and cited to evidence that White was upset on the day of the incident as a result of Giles being at Nicholas' house and of Giles hanging up the phone on White, but agreed that its witness had testified that White looked calm and was quiet. Defense counsel argued against giving this instruction and maintained that there was no evidence that would support giving an EMED instruction.

> THE COURT: Okay. There's another special instructions that was discussed in chambers whether the Court should, uh, provide an instruction Attempted Manslaughter Under Extreme Emotional Distress. And the prosecutor's position?
>
> [PROSECUTOR]: Well, we had concerns about whether or not we should include it, um, because as the Court knows case law of any evidence to support, um, then the Court should --
>
> . . . .
>
> THE COURT: And that question I have and *you actually state the correct statement of the law whether there's any evidence on the record that would support the jury instruction no matter how little or small.*
>
> [PROSECUTOR]: Yeah, any scintilla.
>
> THE COURT: What -- what -- yeah, scintilla. What is the scintilla of the evidence in this case of, uh, emotional distress --
>
> . . . .
>
> [PROSECUTOR]: The State would, uh, state that, um, it was the defendant's, um, girlfriend at the time was at the complaining witness's home. He found out about it while at work. He, uh, made phone -- this is according to the complaining witness's testimony. Made -- made phone calls to the complaining witness.
> Um, he was upset about it. Um, he wrote back "WTF." Um, he left work, changed his clothes, went to the house carrying the knife, and then the girlfriend was still at the house, um, sleeping on the bed.
>
> THE COURT: But your complaining witness said he looked calm and he just didn't -- he was quiet.
>
> [PROSECUTOR]: Yes.
>
> . . . .

> THE COURT: Okay. Anything else you wanna put? I'm gonna ask [defense counsel] his position on the evidence.
>
> [PROSECUTOR]: Um, other than, uh, also, um, there was the testimony defendant was upset while at work as well about personal issues including his, uh, girlfriend, and, um, it was after that that he went back to, um, uh, Jeremy's house while the -- the girlfriend was at Jeremy's house.
>
> THE COURT: Okay. [Defense counsel]?
>
> [DEFENSE COUNSEL]: We would object to the instruction. We don't believe that there's, um, any evidence in the record my client had a problem, uh, with, uh, Jeremy Nicholas, and that's really the -- the -- the question and -- on a EMED is whether the defendant, um, was undergoing any kind of emotional stress and trauma at the time that he, uh, allegedly committed this offense, and there's nothing in the record to suggest that.

(Emphasis added.)

Defense counsel then elaborated on why there was no evidence to support giving the EMED instruction and why White's actions were the product of self-defense. The Circuit Court agreed with defense counsel:

> THE COURT: -- the -- while the Court is aware of the, uh, if there's a scintilla of evidence the Court must provide it even if the defendant does not request it, the Court does not see any scintilla of evidence to support the providing of an emotional -- extreme emotional, uh, extreme --
>
> [DEFENSE COUNSEL]: Distress.
>
> THE COURT: -- distress manslaughter -- attempted manslaughter instruction and that it would only serve to confuse the jury, and therefore the Court is not giving that instruction. . . .

The Circuit Court then instructed the jury without including an EMED instruction and the parties proceeded to give their closing arguments. The State included the above-recounted facts implicating Giles' affair with Nicholas and White's emotional reaction to finding Giles at Nicholas' house in its closing argument to refute White's self-defense theory, suggesting that the motive for the attack was White's jealousy:

> [PROSECUTOR]: And why did the defendant do this? Simple. Jealousy. That's the reason why he did it. His girlfriend was at -- this defendant's girlfriend was at Jeremy's house, and when he found out about that he was upset.
>
> And so when he was -- when he heard about this he called, found out she was there. He goes over to the house unannounced, uninvited and then slits Jeremy's throat.

> That is not a coincidence that that happened. It shows you that the defendant had a motive to do this, and because he had a motive there's no self-defense. So that's why the defendant in this case is guilty as charged of Attempted Murder in the Second Degree. Plain and simple.

The case was submitted to the jury, which found White guilty of Attempted Murder in the Second Degree.

### 2. Events following trial

One week later, White filed his Motion for New Trial. In the motion, White highlighted the State's closing argument implicating his jealousy over Giles' affair with Nicholas, noting that "[t]he State's position in closing was in contravention of the State's previous position that there was no evidence of extreme or emotional disturbance. Such an argument clearly invited the jury to consider [White's] mental and emotional condition as a motive for the alleged conduct." At the hearing on White's motion, the State argued that "jealousy does not equate EMED," and that the logic of White's argument would require an EMED instruction in every case where the State talks about motive. On June 23, 2015, the Circuit Court granted the motion and entered the Order Granting Motion for New Trial ("Order for New Trial"), stating that, in retrospect:

> The Court finds that there was a "scintilla" of evidence adduced at trial indicating that defendant may have committed the offense under extreme mental or emotional duress. Therefore in accordance with *State v. Adivento*, [sic] 132 Hawaiʻi 123 (2014) a jury instruction on the affirmative mitigating defense of extreme mental or emotional disturbance ("EMED") should have been given, notwithstanding the fact that both Defendant and the State had chosen to waive giving of the instruction as part of trial strategy.

On July 1, 2015, the State filed its timely Notice of Appeal.

## II. POINTS OF ERROR

On appeal, the State contends that the Circuit Court (1) erred in granting the Motion for New Trial because defense counsel and the Circuit Court agreed at the close of evidence that there was no evidence to support EMED; and (2) plainly erred in granting a new trial without first vacating or setting aside the verdict.

III. STANDARD OF REVIEW

### Motion for a New Trial

"[T]he granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *State v. Yamada*, 108 Hawai'i 474, 478, 122 P.3d 254, 258 (2005) (citation omitted). It is well-established that an abuse of discretion occurs if the trial court has "clearly exceed[ed] the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (citation omitted).

Furthermore, at a hearing on a motion for new trial, the trial court acts as the trier of fact. *State v. St. Clair*, 101 Hawai'i 280, 287, 67 P.3d 779, 786 (2003) (citation omitted).

In this jurisdiction, a trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed. And where there is substantial evidence, which is credible evidence of sufficient quantity and probative value to justify a reasonable person in reaching conclusions that support the FOFs, the FOFs cannot be set aside. Moreover, an appellate court will not pass upon issues dependent upon credibility of witnesses and the weight of the evidence; this is the province of the trial judge.

*Id.* (citations, internal quotation marks, and brackets omitted). A trial court's conclusions of law, however, are reviewed *de novo*, under the right/wrong standard of review. *State v. Kido*, 109 Hawai'i 458, 461, 128 P.3d 340, 343 (2006).

*State v. Hicks*, 113 Hawai'i 60, 69-70, 148 P.3d 493, 502-03 (2006).

### Jury Instructions

The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. In other words, error is not to be viewed in isolation and considered purely in the abstract.

*State v. Kassebeer*, 118 Hawai'i 493, 504, 193 P.3d 409, 420 (2008) (internal quotation marks, citations, and brackets omitted) (quoting *State v. Mainaaupo*, 117 Hawai'i 235, 247, 178 P.3d 1, 13 (2008)). In this context, "the real question becomes

whether there is a reasonable possibility that error might have contributed to conviction." *State v. Arceo*, 84 Hawai'i 1, 12, 928 P.2d 843, 854 (1996) (quoting *State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995)).

IV. DISCUSSION

A. The trial court's obligation to instruct the jury on EMED turns on whether there is *any* evidence of a subjective nature that a defendant acted under a loss of self-control resulting from EMED.

The State's first point of error is that the Circuit Court erred in granting the Motion for New Trial because "the defense counsel and [Circuit Court] agreed at the close of evidence that there was no evidence to support [a jury instruction regarding] EMED," and therefore the Circuit Court did not err in not giving this instruction during the trial. In sum, the State argues that an exception to the rule under *State v. Adviento*, 132 Hawai'i 123, 319 P.3d 1131 (2014) applies in this case because the record does not reflect any evidence of EMED at the time of the offense and because the Circuit Court agreed with White's objection to the giving of instructions of EMED during trial. White counters that "[t]here was ample evidence offered during the trial that would support an EMED instruction[,]" and that "the [Circuit Court] appropriately acknowledged its error and properly granted the Defendant's Motion for New Trial[.]" The State additionally argues, for the first time in its reply brief, that the doctrine of judicial estoppel precludes White from changing his position in filing the Motion for New Trial.

1. There was a "scintilla" of evidence of EMED at the time of the offense to require that an EMED instruction be given.

*Adviento* dictates the general rule regarding EMED and EMED jury instructions:

> EMED "reduces the offense to manslaughter or attempted manslaughter," if "the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation." HRS § 707-702(2). The trial court is obligated to provide an EMED instruction if the

"record reflects *any* evidence of a subjective nature that the defendant acted under a loss of self-control resulting from [EMED]." *[State v. ]Aganon*, 97 Hawai‘i [299,] 304, 36 P.3d [1269,] 1274[ (2001]. The court views "the evidence ... in a light most favorable to the appellant in determining whether or not the instruction should [have been] given." *State v. O'Daniel*, 62 Haw. 518, 528, 616 P.2d 1383, 1390-91 (1980).

A defendant asserting the EMED defense is not required to "show he or she has been exposed to 'an extremely unusual and overwhelming stress.'" *State v. Seguritan*, 70 Haw. 173, 174, 766 P.2d 128, 129 (1988). "On the contrary, the statute focuses . . . on the <u>defendant's reaction to the stress</u>, and requires only that the defendant be under the influence of extreme mental or emotional disturbance for which there is 'a reasonable explanation.'" *Id.* (emphasis added). "The disturbance was meant to be understood in relative terms as referring to a loss of self-control due to intense feelings." *State v. Matias*, 74 Haw. 197, 205, 840 P.2d 374, 378 (1992) (quoting *[State v.] Dumlao*, 6 Haw.App. [173,] 180, 715 P.2d [822,] 828[ (1986)]).

*Adviento*, 132 Hawai‘i at 150, 319 P.3d at 1158.

Despite conceding in its opposition to White's Motion for New Trial that "a defendant cannot waive an EMED instruction," the State also contends that the "sole exception" to that proposition is "if the defendant objects to the giving of the instructions of manslaughter (EMED) <u>on the basis that the record does not reflect any evidence on this issue, and the trial court agrees with the defendant</u>," citing *State v. Sawyer*, 88 Hawai‘i 325, 332-33, 966 P.2d 637, 644-45 (1998) (quoting *State v. Warner*, 58 Haw. 492, 500, 573 P.2d 959, 964-65 (1977), *overruled on other grounds by Sawyer*). The mischaracterized "sole exception," however, assumes that the record does not reflect any evidence of EMED, and therefore represents an alternative fact situation not present in this case and not an exception to the *Adviento* principle.

The sole question is the one addressed by the Circuit Court, which is whether "the record reflects *any* evidence [(i.e., a "scintilla" of evidence)] of a subjective nature that the defendant acted under a loss of self-control resulting from EMED." *Adviento*, 132 Hawai‘i at 150, 319 P.3d at 1158 (quoting *Aganon*, 97 Hawai‘i at 304, 36 P.3d at 1274) (internal quotation marks and original brackets omitted). The focus of this inquiry is "on the <u>defendant's reaction to the stress</u>, and requires only that the defendant be under the influence of extreme mental or

emotional disturbance for which there is 'a reasonable explanation.'" *Id.* (quoting *State v. Seguritan*, 70 Haw. 173, 174, 766 P.2d 128, 129 (1988)) (internal quotation marks omitted).

Here, Nicholas admitted that he had an affair with Giles while White and Giles were in a relationship and that White was aware of this. White then testified that after discovering that Giles was sleeping at Nicholas' house and after Giles would not take his phone calls he sent a text message to Nicholas saying "WTF," explaining in his testimony that the message was intended to convey frustration and aggravation with Giles hanging up the phone. Nicholas corroborated this testimony and testified that upon showing up at Nicholas' house to pick up Giles, White "seemed upset from what I noticed . . . . He was kinda quiet and wasn't really talking. That's not normal." Further, right before the attack, White testified that Nicholas asked in a "kinda weird way . . . 'Why does [Giles] keep showing up?'" and that White "got kinda like mad" when Nicholas made a comment about Giles being a "narc." Although jealousy may not conclusively establish EMED, the supreme court has recognized that "the jealousy of a jilted lover" culminating in a violent reaction could support an EMED instruction.[5]

White's and Nicholas' testimonies discussing White's negative emotional reaction to Giles being at Nicholas' home, sleeping in Nicholas' bed, and repeatedly hanging up on White demonstrate that there existed at least a "scintilla" of evidence of a subjective nature that White may have acted under a loss of self-control resulting from EMED. Consequently, we agree, the Circuit Court was independently obligated, notwithstanding defense counsel's initial objection, to provide the EMED

---

[5]   *See, e.g.*, State *v. Espiritu*, 117 Hawaiʻi 127, 146, 176 P.3d 885, 904 (2008); *see also State v. Kauhi*, No. 26943, 2006 WL 1519404, at *14, 16 (Hawaiʻi May 31, 2006) (addressing whether an EMED instruction should have been given when the defendant argued that she "had an emotional reaction to [victim's] romantic affair with another woman, as a result of which there was a loss of self-control and reason was overborne by intense feelings of passion, anger and jealousy[,]" but holding that an EMED instruction was not warranted because evidence supported the prosecution's assertion that the defendant was unaware of a relationship between the victim and another woman).

instruction based on the evidence. *See Adviento*, 132 Hawaiʻi at 140, 150, 319 P.3d at 1148, 1158; *see also Sawyer*, 88 Hawaiʻi at 334, 966 P.2d at 646 (ruling that the trial court did not err in not giving an attempted EMED manslaughter instruction because "the record was *devoid* of *any* evidence that Defendant acted while under the influence of a reasonably induced loss of self-control due to [EMED]" (some emphasis added)); *State v. Moore*, 82 Hawaiʻi 202, 210-211, 921 P.2d 122, 130-131 (1996)) (noting that there was no testimony presented on the defendant's state of mind at the time he shot the victim and therefore "there was no error in failing to instruct the jury on attempted EMED manslaughter because there was *absolutely no evidentiary support* for the mitigating defense." (emphasis added)).

Further, although itself not representing the evidence, the State's closing argument focused on jealousy as White's motive for committing the offense, plainly asserting that "defendant's girlfriend was at [Nicholas'] house, and when he found out about that he was upset." Thus, there is a reasonable possibility that this focus invited the jury to consider White's mental and emotional condition and that the absence of the EMED instruction contributed to White's conviction. *See Arceo*, 84 Hawaiʻi at 12, 928 P.2d at 854 (quoting *Holbron*, 80 Hawaiʻi at 32, 904 P.2d at 917).

> 2. The doctrine of judicial estoppel does not preclude White from changing his position regarding the giving of an EMED instruction.

The principle of judicial estoppel "prevents parties from playing 'fast and loose' with the court or blowing 'hot and cold' during the course of litigation." *State v. Fields*, 115 Hawaiʻi 503, 534, 168 P.3d 955, 986 (2007) (quoting *Roxas v. Marcos*, 89 Hawaiʻi 91, 124, 969 P.2d 1209, 1242 (1998)). Unlike the case in *Fields*, however, the defendant's "shifting representations" here only arose after the State framed White's actions as an emotional reaction on closing. *See Adviento*, 132 Hawaiʻi at 146, 319 P.3d at 1154 ("In order to insure that the trial court fulfills its ultimate obligation to properly instruct

the jury on the law and the jury meets its duty to 'render true verdicts based on the facts presented,' the trial court is required to instruct the jury on the EMED defense *notwithstanding a defendant's 'waiver.'*" (emphasis added) (quoting *State v. Haanio*, 94 Hawaiʻi 405, 414, 16 P.3d 246, 255 (2001), *overruled on other grounds relating to eye witness identification and harmless error by State v. Flores*, 131 Hawaiʻi 43, 314 P.3d 120 (2013))). Therefore, even though the issue was not identified as having been raised below in the opening brief, Haw. R. App. P. 28(b)(4), or responsive to anything presented in the answering brief, Haw. R. App. P. 28(d), the State's judicial estoppel argument is without merit.

B.   The Circuit Court had jurisdiction to issue the Order for New Trial.

The State's second point of error, also raised for the first time in its reply brief, is that the Circuit Court committed plain error in issuing the Order for New Trial without vacating or setting aside the verdict. The State does not provide any support for its argument, and nothing in Hawaiʻi Rules of Penal Procedure ("HRPP") Rule 33[6] requires a court to vacate or set aside a verdict before granting an order for a new trial. Furthermore, a reply brief is "confined to matters presented in the answering brief," and "[p]oints not argued may be deemed waived." Haw. R. App. P. 28(b)(7) and (d). Therefore, we reject the State's second point of error.

---

[6]   HRPP Rule 33 provides:

> The court on motion of a defendant *may grant a new trial to the defendant if required in the interests of justice.* If trial was by the court without a jury, the court on motion of a defendant for a new trial *may* vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial shall be made within 10 days after verdict or finding of guilty or within such further time as the court may fix during the 10-day period. The finding of guilty may be entered in writing or orally on the record.

Haw. R. Penal P. 33 (emphasis added).

V.    DISPOSITION

Based on the foregoing, the Order Granting Motion for New Trial filed on June 23, 2015 in the Circuit Court of the Third Circuit is affirmed.

DATED:   Honolulu, Hawai'i, February 28, 2018.

On the briefs:

Dale Yamada Ross,
Deputy Prosecuting Attorney,
County of Hawai'i,
for Plaintiff-Appellant.

William A. Harrison
(Harrison & Matsuoka)
for Defendant-Appellee.

Presiding Judge

Associate Judge

Associate Judge

13